## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LYNDA A. STEWART, | CASE NO. 1:13-cv-02312-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 5, 6, 7, 10, 11 |

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Lynda A. Stewart for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 401-433, 1382-1383 (the "Act"). Plaintiff was unrepresented at the ALJ hearing, and alleges that she did not knowingly waive her right to counsel and that the ALJ failed to develop the record. Plaintiff has severe mental impairments that limit her insight into her disease. She is dependent on her sister, who accompanied her to all of her most recent mental health treatments and is the only person who takes her shopping or out to eat. After the hearing, Plaintiff's sister submitted an affidavit stating that she had accompanied Plaintiff to the hearing, but had not been allowed to enter the room or testify, despite her belief that Plaintiff was allowed to have others assist in presenting her case. Plaintiff's sister's affidavit also indicates that the ALJ was aware of her presence outside the courtroom and her desire to testify. Because the record indicated both that Plaintiff's severe mental impairments limited her insight into her disease and that Plaintiff was dependent on her sister, the ALJ failed to discharge her heightened

duty to develop the record for pro se claimants by refusing to allow Plaintiff's sister to testify. Consequently, the Court will grant Plaintiff's appeal and remand her claim to the Commissioner for further proceedings.

## II.      Procedural Background

On April 20, 2011, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 137-48). On May 31, 2011, the Bureau of Disability Determination denied these applications (Tr. 87-106), and Plaintiff filed a request for a hearing on June 8, 2011.  (Tr. 109-113). On May 15, 2012, an ALJ held a hearing at which Plaintiff— who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 61-86).  On May 21, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 25-47). On July 23, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 20-22), which the Appeals Council denied on July 18, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On September 5, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 12, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 5, 6). On December 23, 2013, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 7). On February 25, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). On March 4, 2014, Plaintiff filed a brief in reply. (Doc. 11). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 10, 2014 and an order referring the case to the undersigned for adjudication was entered on June 19, 2014. (Doc. 14, 15).

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. <u>Johnson v. Commissioner of Social Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. <u>See</u> <u>Jones v. Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." <u>Pierce v. Underwood</u>, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. <u>Jones</u>, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999); <u>Johnson</u>, 529 F.3d at 200.

### IV.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); <u>id.</u> § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  Id. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on August 31, 1961 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563; (Tr. 41).   She has at least a high school education and past relevant work as a registered medical assistant. (Tr. 41).

**Medical Evidence**

On July 1, 2010, Plaintiff saw Dr. Natale Falanga, M.D. to have FMLA and disability forms filled out. (Tr. 384). Dr. Falanga assessed her to have work related anxiety causing depression. (Tr. 384). Notes indicate that Plaintiff "is under a tremendous amount of stress. She is depressed and a lot of it is due to her job as she is having harassment issues at the job." (Tr. 384). Dr. Falanga wrote that Plaintiff "has been unable to work as of May 17, 2010 and the disability is expected to last until October 1, 2010." (Tr. 384). She completed a FMLA form the same day indicating that she was unable to do any work. (Tr. 418-420). She also completed a short-term disability form that indicated that Plaintiff had worsening stress and anxiety because her mother was in a nursing home and she was dealing with harassment issues at work. (Tr. 414). She indicated that Plaintiff was mentally clear, but tearful with rapid speech. (Tr. 414). She indicated that Plaintiff was unable to deal with coworkers and supervisors during the workday and was being treated with Paxil. (Tr. 414). She also indicated that Plaintiff was being seen by Dr. Michael Kessler, M.D., a psychiatrist. (Tr. 415).

On September 14, 2010, Plaintiff saw Beth Moses, M.S.N., at Rosewood Counseling Service. (Tr. 441). She presented depressed and sullen. (Tr. 441). Her affect was somewhat labile and she had flat, then pressured speech. (Tr. 441). She continued to have evidence of anxiety, particularly about returning to work, as she felt "abused" at work. (Tr. 441). She had no motivation or concentration, could not read or watch television, was sleeping most of the time, and had experienced weight gain. (Tr. 441). She was assessed a GAF of 55.

On September 30, 2010, Plaintiff followed-up with Dr. Falanga, who again assessed her to have worked related anxiety causing depression and extended her disability to January 1, 2011. (Tr. 383).

On October 28, 2010, Plaintiff followed up with Ms. Moses. (Tr. 441). She had a flat affect and a lack of motivation and stimulation, reporting that she does "nothing" during most of the day. (Tr. 441). Ms. Moses observed "anxiety and anger when discussing [return to work]. No contact from former employer or co-workers. Lacks purpose and meaning in life." (Tr. 441). Ms. Moses also noted that "[return to work] unknown at this time. Recommend client be away from work environment until 1st of the year. Explore other career options, as previous work causes client extreme anxiety." (Tr. 441). She also noted that Plaintiff "need[s] to get up at same time each day and involve self in something meaningful, even if part-time volunteer." (Tr. 441).

On November 23, 2010, Plaintiff followed-up with Ms. Moses. (Tr. 440). Her affect was flat and blunted and she "seem[ed] more depressed." (Tr. 440). She "lack[ed] purpose and motivation-not in any position to return to work at this time. Overall, client is unchanged, and needs to try to set small attainable goals." (Tr. 440). She was assessed a GAF of 55. (Tr. 440).

On December 30, 2010, Plaintiff followed-up with Dr. Falanga, for a refill of medications and to have multiple forms filled out. (Tr. 382). She continued to assess Plaintiff with work related anxiety causing depression. (Tr. 382). In an Attending Physician's Statement completed the same day, she extended Plaintiff's depression for another four to six months. (Tr. 410-412). She noted that Plaintiff had retrogressed and was more sad and isolated. (Id.). She indicated subjective symptoms of crying, inability to concentrate, and inability to sleep. (Id.). She indicated objective symptoms of flat affect and a fatigued appearance. (Id.). She opined that Plaintiff had "marked" mental limitations and was unable to handle stress or interpersonal relations. (Id.).

On January 3, 2011, Plaintiff followed-up with Ms. Moses. (Tr. 439). There was "virtually no change from the previous session." (Tr. 439). Her affect was blunted and flat, she

was very isolated and reclusive, and sleeping too much. (Tr. 439). She "feels a lack of purpose, but feels great anxiety when discussing [return to work]." (Tr. 439). She recommended "continued disability with ongoing therapy" and recommended volunteer opportunities close to home, "even if one day a week." (Tr. 439).

On March 22, 2011, Plaintiff followed-up with Ms. Moses and expressed frustration that she was unable to financially commit to ongoing therapy. (Tr. 438). She continued to lack motivation but Ms. Moses encouraged her to find a social agency that was more affordable. (Tr. 438).

On May 2, 2011, Ms. Moses completed a Medical Source Statement. (Tr. 435). She opined that Plaintiff had moderate limitations in her ability to interact with the public and marked limitations in her ability to interact appropriately with supervisors and coworkers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 436). Ms. Moses based these limitations on her past conflictual history with peers and supervisors, noting that in the past she could not "adjust to work setting changes and pressure of computer system." (Tr. 436). She opined that Plaintiff's social functioning was limited, her self-care was limited because she was overeating and sleeping too much, and her productivity was limited because she lacked interest. (Tr. 437). She also identified Plaintiff's limited contact with her peers. (Tr. 437). She indicated that Plaintiff was not always able to manage benefits on her behalf because she "appears competent, but limited in judgment." (Tr. 437).

On May 3, 2011, Plaintiff had an intake evaluation at NHS Human Services. (Tr. 475). She explained that she did not have insurance, but had been having increased anxiety and depression after working with cancer patients over the last twenty years. (Tr. 475). She had a

blunt affect, but her mental status exam was otherwise normal. (Tr. 486). She was assessed to have major depressive disorder, generalized anxiety disorder, and a GAF of 60. (Tr. 487). She was recommended for medication management and individual therapy. (Tr. 487).

On May 27, 2011, state agency physician Dr. Francis Murphy, Ph. D, reviewed Plaintiff's evidence and completed a Psychiatric Review Technique Form and a mental RFC assessment. Dr. Murphy opined that Plaintiff had mild impairments in activities of daily living, mild impairments in social functioning, and no episodes of decompensation. (Tr. 88). He indicated that there were no medical source opinions in the file. (Tr. 90). He opined that Plaintiff was moderately limited in her ability to perform a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and maintain attention and concentration for extended periods of time (Tr. 93). Dr. Murphy opined that she had no other limitations. (Tr. 92-93).

Plaintiff was brought to Bloomsburg Hospital on October 14, 2011, and involuntarily hospitalized. (Tr. 495-96). Notes indicate that she was brought to Bloomsburg Hospital by police with a chief complaint of anxiety and depression. (Tr. 495-96). Her discharge summary indicates that::

> [Plaintiff reported] "I am a victim of domestic violence. He is following me. I am afraid of him. He is a lunatic and an alcoholic. I am fearing for my life I applied for PFA. It is causing discontent. I didn't get the PFA. I was escorted from legal services then. Feeling unsafe at the safe house." Is agitated prior to admission…Speaking very fast, having circumstantial speech. She is paranoid. Having grandiose delusions that the patient is a "savior." Patient's children do not live at the home. They refused to communicate with the patient. Patient reports she is trying to go to different places asking for help for the past 38 hours. States her condition escalated because of her lack of help. Patient reports she could not sleep. She is not eating as well because she is feeling distressed, obsessed with orderliness, racing thoughts and asking somebody to drive her car to Bloomsburg….

(Tr. 495-96). Plaintiff's hospital course indicated that she:

Started on medications such as Risperdal…tolerated this medication well. Had not reported any side effects….Eventually, patient's mania subsided to where she was more coherent. She realized she was more coherent. She was not as active. She was not speaking as quickly and interrupting or difficult to interrupt. Her flight of ideas and looseness of association subsided. Patient was still concerned about her safety, well being and was still looking to get a PFA against potential abuser. This did not seem to be delusional-or hallucination-like symptoms…agreed to follow-through with our follow-up care plan and no longer needed the care of a 24-hour lock down psychiatric unit. Was discharged appropriately to home.

(Tr. 496-96).

On November 3, 2011, Plaintiff followed up at NHS. (Tr. 587). She had a normal mental status examination, but discussed her October hospitalization. (Tr. 587). She indicated that she was hospitalized after getting agitated at a women's shelter after accusing her boyfriend of domestic violence, but did not "produce and details" and stated "I do not know why I was hospitalized." (Tr. 587).On December 15, 2011, Plaintiff followed-up and was doing "very well." (Tr. 586). She had a normal mental status examination. (Tr. 586). However, on January 11, 2012, Plaintiff followed-up and was "regressing." (Tr. 585). She had depressed mood and blunted affect. (Tr. 585).

On January 26, 2012, Plaintiff followed-up at NHS and was still "regressing." (Tr. 584). She had slow speech, blunted affect, and depressed mood. (Tr. 584). Her sister accompanied her, and confirmed that she had been very hyper, spent a lot of money, and acted "very unusual" in October. (Tr. 584). On February 2, 2012, she followed-up at NHS and again came with her sister. (Tr. 583). She indicated that she felt the same and was feeling very slow. (Tr. 583). Her mental status exam indicated depressed mood and blunted affect. (Tr. 583). She followed up at NHS on February 16, 2012, and her mental status exam indicated slow speech, blunted affect, and depressed mood. (Tr. 582). She was again accompanied by her sister. (Tr. 582). She was "very depressed," "not any better," and "fe[lt] slow and medicated." (Tr. 582). On March 8, 2012,

Plaintiff followed-up at NHS with her sister. (Tr. 581). She was tolerating her medications well, but she had depressed mood and blunted affect. (Tr. 581). She had made only "limited progress." (Tr. 581).

On April 4, 2012, Plaintiff followed-up at NHS. (Tr. 580). She reported that she felt a "bit" better, but could not sleep without Ambien. (Tr. 580). She came with her sister and presented with depressed mood and blunted affect. (Tr. 580). She had only made "limited progress." (Tr. 580). On May 3, Plaintiff followed-up at NHS. (Tr. 579). Although she said she was a "lot better," Dr. Yampolsky assessed her to have made "no change," so she had not even made limited progress since her last visit. (Tr. 579). She continued to report that she could not sleep without Ambien. (Tr. 579). She had been on Comictal for five weeks and her "improvement [was] only about 10%." (Tr. 579). She reported increased anxiety and refused to consider taking a second medication until after her disability hearing. (Tr. 579).

On May 3, 2012, Dr. Yampolsky provided Plaintiff with a note that read "[a]s per your request I am reporting to you, Linda Stewart, that you have been treated at this clinic for severe bipolar disorder…and not able to keep any job." (Tr. 588).

### Function Report, Testimony, and ALJ Findings

On April 29, 2011, Plaintiff submitted a Function Report. (Tr. 182-91). She reported that she was severely depressed, has excessive anxiety, and is unable to handle any stressful situation. (Tr. 184). She reported that she cannot concentrate or focus and that her memory is poor with minimal recall. (Tr. 184). She reported that she is unable to sleep well and that her social skills are lacking. (Tr. 184). She reported that she runs errands for her father and cares for pets. (Tr. 185). She indicated that she does not always shower or dress on a daily basis. (Tr. 185). She reported that she can do some chores, but needs encouragement, motivation, and assistance. (Tr.

186). She indicated that she can drive and shop in stores. (Tr. 187). She explained that it is more difficult for her to manage money due to a lack of concentration and double-checking, which makes it very time consuming and stressful for her. (Tr. 187). She reported that she has decreased interest in "most everything," but was able to occasionally go out to movies and eat and texts on a daily basis. (Tr. 187). She reported that she does not have problems getting along with others but that she has a decreased desire for social activities. (Tr. 187). She reported that she does not feel safe in her neighborhood and does not handle changes in routine well. (Tr. 190).

On Plaintiff's disability appeals report, she indicated that she would "look into acquiring legal counsel" but that her "reasons and my illnesses should reverse" the Commissioner's decision. (Tr. 199). She explained that she, "alone," was entitled to the benefits and did not want to have to "give up, or share, any of the benefits." (Tr. 199).

On May 15, 2012, Plaintiff appeared and testified at the ALJ hearing. (Tr. 63). Plaintiff was not represented by counsel. The ALJ stated that:

> ALJ: I am going to go over---in the notice of hearing, you also had your right to representation notice, and you do have a right to be represented by either an attorney or a non-attorney, who can assist you in handling the case, preparing the case and representing you at the hearing.
>
> Representatives usually charge a fee by fee agreement or fee petition. Fee agreements, it's usually $6,000.00 or 25 percent of past-due benefits, whichever is the lesser. And they can charge whether it's a favorable or unfavorable for expenses, such as copying the records obtaining the records and so forth. There are some legal organizations that offer free representation, but they are usually need based.
>
> You can, however, proceed today without a representative. Do you understand your rights to representation?
>
> Plaintiff: I believe so.
>
> ALJ: Okay. And are you willing to proceed today without a representative?

Plaintiff: Yes, please.

(Tr. 65-66).

Plaintiff testified that she lives alone in a house. (Tr. 70). She testified that she had not driven since early January as a result of her medication. (Tr. 73). She testified that she was unable to work because she could not "handle any stress," had excessive anxiety as a result of her depression, found it difficult to focus or concentrate, and had memory problems and loss. (Tr. 74). The ALJ repeatedly asked her about the representations she made in order to obtain unemployment insurance, and Plaintiff explained that she goes online and "check[s] off the same boxes every time [she] goes on." (Tr. 75). She explained that she had stopped doing errands for her father after her hospitalization. (Tr. 76). She testified that she watches television, but cannot always pay attention to it, and cannot focus enough to read. (Tr. 76). She testified that she does not have any hobbies and has not gone out to dinner or a movie for "quite some time." (Tr. 77-78). She explained that her sister came over on Thursdays and they went to Burger King. (Tr. 78). She testified at the hearing that she only went shopping when her sister takes her to Shop Rite for food once a week. (Tr. 79). She testified that she had gone on a trip with her then-boyfriend "before the incident in October." (Tr. 80). She testified that she had tried to do the volunteer work suggested by her counselor, but was unable to do so because they wanted her to be able to answer phones and interact with people, which she could not do. (Tr. 79).

A vocational expert also appeared and testified. (Tr. 80). She testified that, based on the RFC assessed by the ALJ below, Plaintiff could not engage in her past relevant work, but could engage in work in the national economy, such as a general office clerk, a stock worker, and courier order clerk. (Tr. 80-83). The vocational expert also testified that, if Plaintiff would be off task twenty percent (20%) of the day, there would be no work Plaintiff could perform. (Tr. 84).

The ALJ asked Plaintiff "[d]o you have any questions for the vocational expert?" to which Plaintiff replied "Am I allowed to comment on what was said or is this not the time?" (Tr. 84). The ALJ responded "[y]ou can comment, yes. I mean, I'll let you know if she can respond to it, but certainly."(Tr. 84). Plaintiff stated "I just, at this point, don't feel that I would be able to stay on task of anything. I just don't have that capability." (Tr. 84). The ALJ responded, "Okay. And I'm going-you said you had another note…" and proceeded to allow Plaintiff to introduce Dr. Yampolsky's most recent note to the record. (Tr. 84). Plaintiff did not ask any questions of the vocational expert. (Tr. 84).

On May 21, 2012, the ALJ issued her decision. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 13, 2010, the alleged onset date. (Tr. 30). At step two, she found that Plaintiff's dysthymia, generalized anxiety disorder, major depressive disorder, and bipolar disorder were severe. (Tr. 31). At step three, she found that Plaintiff's impairments did not meet or equal a Listing. (Tr. 32). The ALJ found that Plaintiff had the RFC to engage in work at all exertional levels, subject to the nonexertional limitations that she was limited to simple routine tasks, a low stress work environment, and only occasional interaction with the public, co-workers, and supervisors. (Tr. 34). Based on this RFC, the ALJ found at step four that Plaintiff could not engage in any past relevant work, but found at step five that she could engage in other work in the national economy in positions like a general office clerk, a stock worker, and courier order clerk. (Tr. 41-42).

In evaluating Plaintiff's RFC, the ALJ rejected outright or assigned "little weight" to all five opinions from Plaintiff's treating physician, Dr. Falanga, and Ms. Moses, her therapist. (Tr. 38). The ALJ assigned little weight to Dr. Falanga's short-term disability opinions from July and August of 2010 for private disability insurance because it was "not supported by the evidence of

record," because Dr. Falanga is not a mental health specialist, because the forms do not require Dr. Falanga to identify factors that support her opinion, Dr. Falanga's records contain "minimal mental status examination findings," and Dr. Falanga relied on Plaintiff's subjective complaints, rather than objective medical evidence. (Tr. 38). The ALJ assigned little weight to Dr. Falanga's long term disability form from December 2010, although her reasoning is difficult to discern, as she wrote that the form:

> [I]ndicat[es] disability commenced in July 2010, it arises out of claimant's employment, diagnosis of depression and anxiety; she sees claimant every three months; conditions are treated with medication and counseling; objective findings of appears fatigued and flat effect [sic]; that claimant was unable to engage in stress [sic] situations or engage in interpersonal relations (marked limitation); believed claimant was competent to endorse checks and direct use of the proceeds, and was not capable of working within the limitations noted. Nevertheless, Dr. Falanga indicated these limitations would apply for 4-6 months.

(Tr. 39). Beyond summarizing the note, the ALJ does not explain how much weight she assigned to this form.

The ALJ gave "no weight" to Dr. Falanga's Employability form in April 2011 because "[i]t is a standard and very common practice for a treating physician to support and accommodate claimant's applications for public assistance with the completion and execution of these forms. Claimants require these forms to access…health insurance. As such, the physician has both an altruistic and financial interest in aiding their patients." (Tr. 39). The ALJ also found that this opinion was "without support" because the forms "do not require the doctor to justify their opinions through objective medical findings," because Dr. Falanga's treatment records indicate "minimal mental status examination findings," are based on subjective complaints, and Plaintiff did not require "more frequent of [sic] intensive treatment." (Tr. 39). The ALJ gave "no weight" to Dr. Falanga's May 2011 opinion for the same reasons. (Tr. 39).

The ALJ rejected Ms. Moses' opinion because it was "not well supported by the evidence

of record." (Tr. 40). Specifically, she found it to be inconsistent with "the mental status examination findings," the GAF scores, and her "recommendation that Plaintiff seek other career options or volunteer." (Tr. 40). The ALJ asserted that the objective findings were not "significantly abnormal" and that the fact she only needed to be hospitalized once supports "the inference that claimant has at best moderate symptoms." (Tr. 40). The ALJ concluded that this opinion was also on an issue reserved to the Commissioner. (Tr. 40).

In the RFC assessment, the ALJ assigned "some weight" to Dr. Yampolsky's May 2011 opinion because it was "consistent with the evidence of record, is supportive of the residual functional capacity described above, and is consistent with the findings in this decision that although claimant has moderate limitations because of her mental impairments, she is not precluded from working." (Tr. 40). The ALJ assigned "no weight" to Dr. Yampolsky's May 2012 note because it was "not supported by the evidence of record, was issued at claimant's request, is not supported by the treatment records of NHS, and is not supported by Dr. Yampolsky's [May 2011 opinion] stated [sic] indicating claimant's impairment did not preclude ability to function." (Tr. 40). The ALJ also gave "some weight" to the opinions by the "State Agency" because they were "consistent with the evidence of record and the findings in this decision." (Tr. 40).

The ALJ also found Plaintiff to be less than credible because "the medical evidence indicates" that Plaintiff was not prevented from engaging in work because her mental health status examinations were "minimal" and "not significantly abnormal." (Tr. 37). The ALJ also noted that Plaintiff was able to play tennis, the her therapist had encouraged her to pursue volunteer part-time, her treatment was "routine and conservative," she was not prohibited from driving, she had gone on a trip with her boyfriend, she could engage in some activities of daily

living, and had received unemployment. (Tr. 37).

**Evidence submitted after Plaintiff obtained counsel**

On July 26, 2012, Dr. Yampolsky completed a Mental Impairment Questionnaire. (Tr. 589). He indicated that he had treated Plaintiff once a week since May 18, 2011. (Tr. 589). He assessed her to have bipolar disorder and a current GAF of 55-60. (Tr. 589). He indicated that Plaintiff's symptoms included appetite disturbance, sleep disturbance, mood disturbance, social withdrawal, blunt, flat, or inappropriate affect, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, decreased energy, and depressed mood. (Tr. 589). He opined that Plaintiff is not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations in his evaluation. (Tr. 590). He reported that Plaintiff was treated with medication and individual therapy, with "very slow response." (Tr. 590). He opined that Plaintiff's medications cause drowsiness, fatigue, and lethargy and that her prognosis was guarded. (Tr. 591). He opined that Plaintiff would be absent more than three times per month and would have difficulty working at a regular job on a sustained basis. (Tr. 592). He opined that Plaintiff had moderate restrictions in activities of daily living and concentration, persistence, and pace and marked limitations in social functioning. (Tr. 592). He also opined that Plaintiff had more than three episodes of decompensation of extended duration. (Tr. 593).

On August 3, 2012, Plaintiff's sister, Ellen Meli, completed an affidavit. (Tr. 218). She attested that she was Plaintiff's older sister and sees her about once a week. (Tr. 215). She explained that Plaintiff had first been treated for mental illness when she was hospitalized in her first semester of college, when she was eighteen. (Tr. 215). She explained that Plaintiff "doesn't seem to go to the doctor when she is manic as she feels great during those periods and doesn't realize how irritating and overbearing she becomes…I understand her inability to get along with

co-workers when she is manic as she cannot even get along with family members in that state."
(Tr. 216).

She attested that "in October 2011 Lynda was hospitalized again because she was in an
extremely manic state. She would not listen to anyone in the family. She was behaving oddly.
She reported her boyfriend to the police for abuse. She was spending excessively, planning trips,
renting a car, even though she has one of her own, checking herself into a women's shelter in
Bloomsburg and even leaving her beloved dog in the car. Finally she was admitted to
Bloomsburg Hospital for about a week and was diagnosed with bipolar disorder." (Tr. 216). She
explained that "prior to her admission to the hospital I tried to encourage her to get treatment.
She eventually told me I didn't know what I was talking about and she stopped contact with me."
(Tr. 216). She noted that in January of 2012, Plaintiff called her to ask for her help because she
"was not able to function. She was anxious and depressed and was unable to fall asleep. Her
medication left her in an almost zombie-like state, her eyes would water and she couldn't focus
enough to even read. She was unable to even tell me what she needed from the grocery store, she
couldn't carry on a conversation, she would only answer questions with short answers. She
didn't bathe, brush her teeth or hair or change her clothes unless I was coming. She wouldn't
even go out with our father for lunch, she had contact with no one and just stared at the television
all day." (Tr. 217).

She wrote that "I don't know what has changed over the past two years but I have
watched my sister deteriorate. She has gone from depressed to manic over and over again. Right
now she is a little less depressed; however, she still gets extremely anxious if suggest she try to
do more with her life and her eyes fill with tears." (Tr. 217). She attested that Plaintiff does not
drive because of her medication. (Tr. 217). She also attested that she "drove [her] sister to her

hearing. She wanted me to go with her when she appeared before the Administrative Law Judge; however, when she told the woman that came out to get her the woman told her that I could not go in the room, but that she would mention it to the Judge and if I was needed they would come and get me. It was quite frustrating to be precluded from the hearing without explanation knowing that my sister has difficulty communicating her thoughts other than short answers. It was her and my understanding that she could bring people with her to help present her case." (Tr. 217-218).

### VI.     Plaintiff Allegations of Error

### A.     The ALJ's failure to develop the record

Plaintiff asserts that, *inter alia*, the ALJ failed to develop the record because she refused to allow Plaintiff's sister to enter the hearing room, refused to allow her to present testimony, and failed to obtain a medical source statement from her treating psychiatrist. Plaintiff was unrepresented at the hearing, and an ALJ owes a heightened duty to a pro se claimant to develop the record:

> An ALJ owes a duty to a *pro se* claimant to help him or her develop the administrative record. "When a claimant appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " *Key v. Heckler,* 754 F.2d 1545, 1551 (9th Cir.1985) (quoting *Cox v. Califano,* 587 F.2d 988, 991 (9th Cir.1978)); *Dobrowolsky,* 606 F.2d at 407 (noting that an ALJ must "assume a more active role when the claimant is unrepresented"). *See generally Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir.1995) ("ALJs have a duty to develop a full and fair record in social security cases.")

Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) The Third Circuit has also specifically held that an ALJ must consider reports and allegations by third-parties, such as family members:

> Similar to the medical reports, the ALJ must also consider and weigh all of the non-medical evidence before him. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983); *Cotter,* 642 F.2d at 707. Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, *see Hartranft,* 181 F.3d at 362 (citing 20 C.F.R. § 404.1529), the ALJ must still explain why he is rejecting the testimony. *See Van Horn,* 717 F.2d at 873. In *Van Horn,* this Court set aside an ALJ's

finding because he failed to explain why he rejected certain non-medical testimony. *See* 717 F.2d at 873. In this case, the ALJ explained he rejected Burnett's testimony regarding the extent of her pain because he determined it was not supported by the objective medical evidence. However, the ALJ failed to mention the testimony of Burnett's husband, George Burnett, and her neighbor, Earl Sherman. On appeal, the Commissioner contends the ALJ did not need to mention their testimony because it "added nothing more than stating [Burnett's] testimony was truthful." Commissioner's Brief at 21. This argument lacks merit because the ALJ made a credibility determination regarding Burnett, and these witnesses were there to bolster her credibility. R. 17 ("claimant's allegations of disability made at hearing are unsubstantiated"). In *Van Horn,* we stated we expect the ALJ to address the testimony of such additional witnesses. On remand, the ALJ must address the testimony of George Burnett and Earl Sherman.

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).

Here, the ALJ's failure to allow Plaintiff's sister to enter the hearing room and provide testimony violated her duty to scrupulously develop the record and violated Burnett's mandate that the ALJ consider third-party reports. Plaintiff's dependence on her sister was documented in the record. Moreover, the record indicates that Plaintiff's mental impairments impacted her insight into her own illness or her need for assistance. On Plaintiff's disability appeals report, she indicated that she felt her "reasons and my illnesses should reverse" the Commissioner's decision, so she would not need legal counsel. (Tr. 199). In Ms. Moses's medical source statements he indicated that Plaintiff was not always able to manage benefits on her behalf because she "appears confident, but limited in judgment." (Tr. 437). Plaintiff's hospitalization records indicate that her children refuse to speak to her and that she was "having grandiose delusions that the patient is a "'savior.'" (Tr. 495-96). She also indicated that her condition "escalated because of her lack of help." (Tr. 495-96). Moreover, although Plaintiff realized during her hospitalization that she was "more coherent," (Tr. 495-96), she later indicated that she "did not know why [she] had been hospitalized." (Tr. 587). Treatment notes from NHS indicate that Plaintiff was consistently regressing or showing limited or no progress at follow-ups, and

was accompanied by her sister. (Tr. 579-84). In May of 2012, Plaintiff reported she was a "lot better," but Dr. Yampolsky assessed her to have made "no change." (Tr. 579).

In Plaintiff's function report, she reported that she can do some chores, but needs encouragement, motivation, and assistance. (Tr. 186). At the hearing, she testified that she had not driven since early January as a result of her medication. (Tr. 73). She also testified that she only went out to eat when her sister came over on Thursdays and they went to Burger King. (Tr. 78). She testified at the hearing that she only went shopping when her sister takes her to Shop Rite for food once a week. (Tr. 79). Given Plaintiff's mental impairments, her dependence on her sister, and the Third-Circuit requirement that third-party reports be acknowledged and considered, the Court cannot conclude that the ALJ discharged her duty to develop the record.

Whether the ALJ's failure to obtain a medical source statement from Dr. Yampolsky is a closer question. However, it does appear there is a gap in the record, as the ALJ relied on the state agency physician, who believed that there were no medical source opinions in the file. Thus, the state agency physician failed to consider Ms. Mose's medical source statement. Dr. Yampolsky's medical source statement corroborates Ms. Moses's medical source statement. Consequently, assuming there was a gap in the record, failing to obtain Dr. Yampolsky's opinion caused Plaintiff prejudice. It is unlikely that the ALJ would have substantial evidence to reject multiple consistent opinions from Plaintiff's primary care practitioner, Dr. Falanga, treating counselor, Ms. Moses, and treating psychiatrist, Dr. Yampolsky, in favor of a state agency physician who never examined or treated Plaintiff. Regardless, Dr. Yampolsky's opinion will be before the ALJ on remand, and must be acknowledged, considered, and weighed. Because the Court is remanding, the Court need not address Plaintiff's remaining allegations of error.

## VII.    Conclusion

Therefore, the Court finds that the decision of the ALJ lacks substantial evidence. Pursuant to 42 U.S.C. §§ 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 30, 2014                                        s/Gerald B. Cohn
                                                    _____
                                                    GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE